UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| JEFFREY PAUL BARNARD, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 04-100-B-W |
| | ) | |
| MILLINOCKET POLICE | ) | |
| DEPARTMENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDED DECISION**

The Town of Millinocket and the Millinocket Police Department have moved for summary judgment in this case. (Docket No. 32). Jeffrey Barnard has not responded to the motion and therefore pursuant to the District of Maine Local Rule 56(e) the material facts submitted by the defendants are deemed admitted. Based upon the factual record, I recommend the court **GRANT** the motion.

**Undisputed Material Facts**

Prior to December 3, 2000, the Town received specific information that Jeffrey Barnard, a paroled felon, had weapons at his home in Millinocket in violation of his parole. (Aff. of Donald J. Bolduc ("Bolduc Aff.") ¶ 4.) A background search of Barnard revealed his criminal history and past weapons violations. (Id.) Due to the potential for gun violence and Barnard's history as a violent weapons offender, the Town contacted the Maine State Police Violent Crimes Task Force (the "Tactical Team") so that it could lead and coordinate the situation. (Id.) The Town obtained a search warrant for Barnard's home. (Id.)

On the early morning of December 3, 2000, a tactical meeting was held at the Millinocket Police Department. (Id. ¶ 5.) The meeting was attended by several Millinocket police officers, officers with the Maine State Police Tactical Team, and officers with the federal Bureau of Alcohol, Tobacco and Firearms ("ATF"). (Id.) The Tactical Team led the meeting and gave assignments to the attending officers. (Id.) Millinocket officers were assigned traffic control and perimeter security. (Id.) The plan devised by the Tactical Team was that once the Tactical Team secured the residence and Barnard, Millinocket officers would enter and conduct a search of the home pursuant to the warrant. (Id.) All Millinocket officers had similar assignments and were instructed to await notice that the house was secure before entering. (Id.)

After the tactical meeting on December 3, 2000, the Millinocket officers took their positions at traffic roadblocks and perimeter security. (Id. ¶ 7.) At approximately 5:35 a.m., the Maine State Police Tactical Team entered Barnard's residence. (Id.) Several minutes later, the Town officers were informed that Barnard was in custody and the residence secure. (Id.) No Millinocket officers entered the residence until after the information was received and Barnard was in custody. (Id.) Millinocket officers did not break down the front or bedroom door, make contact with or touch Barnard while he was in his bedroom, or handcuff him. (Id.)

After receiving notice that the residence was secure, several Millinocket officers entered Barnard's house. (Id. ¶ 8.) By the time they entered the residence, the Tactical Team had already handcuffed Barnard and brought him into the living room. (Id.) The Millinocket officers conducted a search of the house, while officers monitored Barnard and two other people in the house. (Id.) That search turned up several illegal weapons in

Barnard's bedroom and around the house, including a loaded rifle next to Barnard's bed and a large hunting knife hidden in the bed.  (Id.)  Barnard was ultimately convicted for these parole violations.  (Id.)

The Tactical Team turned Barnard over to the Millinocket Police for transport and processing.  (Id. ¶ 9.)  Barnard complained that his handcuffs were too tight and they were immediately loosened.  (Id.)  On his way from the residence to the police cruiser, Barnard began complaining of pain.  (Id.)  Barnard was able to walk to the cruiser under his own power.  (Id.)  Barnard was transported to the Millinocket Police Station, where he continued to complain of pain.  (Id.)  The Department contacted the Millinocket Fire Department for a rescue team, and he was taken by ambulance to the Millinocket Regional Hospital at approximately 6:40 a.m.  (Id.)  Barnard was examined at the hospital, received x-rays and found to have no serious injury.  (Id.; Pl.'s Compl. narrative.)  Barnard exited the hospital under his own power and was then taken back to the Millinocket Police Station for processing at approximately 8:15 a.m.  (Bolduc Aff. ¶ 9.)  Later that morning, Barnard was transported and turned over to the Penobscot County Jail, where he was subsequently released.  (Id.)

On December 6, 2000, an arrest warrant was issued for Barnard.  (Id. ¶ 10.)  Later that day, Sergeant Bolduc observed Barnard driving a vehicle in Millinocket and pulled him over.  (Id.)  Barnard exited his car without any complaint or apparent pain or difficulty.  (Id.)  Two other Millinocket officers responded to the scene.  (Id.)  After Bolduc informed Barnard that he was under arrest, Barnard began complaining of back pain.  (Id.)  At first Barnard stated he could not sit in a car because of his back, even

3

though Bolduc had just observed Barnard driving a car minutes before. (Id.) Barnard asked for his lumbar pillow from his car for the transport, which was provided. (Id.)

Once in the cruiser, Barnard continued to complain of pain. (Id.) Barnard was then transported to the hospital emergency room. (Id.) Barnard walked into the hospital under his own power, and officers stayed with him the entire time. (Id.) The medical personnel who treated Barnard told him in Bolduc's presence that he was fine. (Id.) Barnard was later transported to the police station. (Id.) Barnard complained about the mattress on his bunk in his cell and was provided a second mattress, after which he said he was fine. (Id.) Barnard was later transported to the Penobscot County Jail. (Id.)

All Millinocket officers were current in all training requirements of both the Department and the Maine Criminal Justice Academy in the year 2000, including training on search and seizures, entry, arrests, use of force and legal requirements and practices of police officers. (Id. ¶ 6.) Prior to the December 2000 incident there were no prior allegations or accusations of civil rights violations or excessive force against any other Millinocket officer, including the Millinocket officers who had contact with Barnard on December 3 and 6, 2000. (Id. ¶¶ 11, 12.) Since the December 2000 incident there have been no subsequent allegations or accusations of civil rights violations or excessive force against any other Millinocket officer, including the Millinocket officers who had contact with Barnard on December 3 and 6, 2000. (Id.) The Department had no other prior or subsequent complaints that any of the officers involved in either the December 3, 2000, or the December 6, 2000, incidents have violated departmental polices or practices, including polices for use of force and excessive force, arrest procedures, the handling of suspects and arrestees, search and seizure procedures, training requirements or polices

4

regarding the supervision of employees.  (Id. ¶ 13.)   The Department reviewed the Barnard search, arrest and his complaint of excessive force and concluded that there had been no violation of any departmental rules, regulations or practices by any of the Town officers on duty that day.  (Id. ¶ 14.)

## Discussion

A movant is entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, I must view the available summary judgment record in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trialworthy controversy and summary judgment must be denied. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).  As with all summary judgment motions, the availability of any claim-dispositive ruling depends on the quality of the parties' factual proffers.  To determine whether there is a trialworthy issue, I review the summary judgment statement of material fact under the auspices of

this District's Local Rule 56, as outlined in Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004).

I note initially that Barnard has named both the Town of Millinocket and the Millinocket Police Department as defendants in this action. The Millinocket Police Department is an arm of the municipal entity, the Town of Millinocket, and not independently liable under 42 U.S.C. § 1983. While I concur with both defendants that they are entitled to summary judgment on this record, I note separately that the Millinocket Police Department is entitled to judgment even if the Town of Millinocket remained as a defendant.

Several courts have stated, matter-of-factly, that arms of a municipal entity, such as "the police department" in the Town of Millinocket, cannot be sued independently of the municipality because they do not have a legal identity distinct from the municipality. See, e.g., Kujawski v. Bd. Comm'rs of Bartholomew County, 999 F. Supp. 1234, 1237 (S. D. Ind. 1998), rev'd on other grounds, 183 F.3d 734 (7th Cir. 1999); Fanelli v. Town of Harrison, 46 F. Supp. 2d 254, 257 (S.D.N.Y. 1999); Cronin v. Town of Amesbury, 895 F. Supp. 375, 383 (D. Mass. 1995); Post v. City of Fort Lauderdale, 750 F. Supp.1131, 1132 (S. D. Fla. 1990). In almost all of the above cases the court observed that the municipality was also a named party and would remain as the proper defendant vis-à-vis the claims asserted against its subunit or "arm." Fanelli, 46 F. Supp. 2d at 257; Kujawski, 999 F. Supp. at 1237; Post, 750 F. Supp. at 1132 ; Cronin, 895 F. Supp. at 383.

The theory of § 1983 municipal liability evolves from the United States Supreme Court conclusion in Monell, "that Congress did intend municipalities and other local

6

government units to be included among those persons to whom § 1983 applies." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978) (second emphasis added). The Court stated that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." 436 U.S. at 690 n.55.

Subsequently, the Supreme Court's Brandon v. Holt, 469 U.S. 464 (1985) framed the party naming concern by discussing a trio of its cases:

> In at least three recent cases arising under § 1983, we have plainly implied that a judgment against a public servant "in his official capacity" imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond. We now make that point explicit.
> In Monell, the City of New York was not itself expressly named as a defendant. The suit was nominally against the city's Department of Social Services, but that Department had no greater separate identity from the city than did the Director of the Department when he was acting in his official capacity. For the purpose of evaluating the city's potential liability under § 1983, our opinion clearly equated the actions of the Director of the Department in his official capacity with the actions of the city itself.
> Hutto v. Finney, 437 U.S. 678 (1978), was an action against state officials rather than municipal officers. Notwithstanding our express recognition that an order requiring the Arkansas Commissioner of Corrections to pay the plaintiff's counsel fees would be satisfied with state funds, we sustained the order against an Eleventh Amendment challenge. We considered it obvious that the State would pay the award because the defendants had been sued in their "official capacities."
> Less than two years later, we decided Owen v. City of Independence, 445 U.S. 622 (1980), a § 1983 action in which the complaint named as defendants "the city of Independence, City Manager capacities." We held that the qualified immunity that protects public servants acting in good faith was not available to those defendants. In so holding, we expressly distinguished between suits against government officials "in their individual capacities" on the one hand, and those in which "only the liability of the municipality itself was at issue," on the other.

469 U.S. at 471-73 (footnotes omitted). The Court 'noted' that, "the Police Department and the city received notice; no claim is made that the Director of Police and the city were without due notice of the proceedings." (Id.) at 472 n.20.

7

Therefore, the rule is not so much that suits against municipal subdivisions cannot be maintained but that they are in essence suits against the municipality, here the Town of Millinocket. In light of the settled law cited above, the Town of Millinocket was obviously on notice that it was the entity subject to liability vis-à-vis Barnard's claims against the police department. I have therefore analyzed the claims made by Barnard against both named defendants under the legal standards applicable to municipal liability actions, as do the defendants in their memorandum. There is simply no potential § 1983 liability against the police department separate and distinct from the Town's potential federal liability.

The Amended Complaint appears to assert a § 1983 excessive force claim against the Town for its alleged failure to train and supervise officers. The undisputed facts show that Plaintiff's § 1983 claim on those grounds must fail. A municipality can be liable under § 1983 for inadequate police training and supervision, but only where the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). In order to establish municipal liability, plaintiff must prove that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or position officially adopted by [the municipality's] officers or is pursuant to governmental custom even though such a custom has not received formal approval through the body's official decision-making channels." Monell, 436 U.S. at 690-91. Plaintiff must also show a direct causal link between the municipal action and the constitutional deprivation, such that the municipal action was "the cause of and the very force behind the deprivation." Comfort v. Town of Pittsfield, 924 F. Supp. 1219, 1233

(D. Me. 1996). The criteria for establishing a § 1983 claim based upon a municipality's failure to train are "exceptionally stringent." City of Canton, 489 U.S. at 388-89.

      The undisputed facts show no deliberate indifference on the part of the Town, and no custom or practice which violated Plaintiff's constitutional rights. Furthermore, on the undisputed facts of this record, there is simply no evidence of a constitutional deprivation (or a violation of tort law, for that matter) by any individual employed by or associated with the Town of Millinocket. The Town provided its officers with required training in the use of force, search and seizures, entry, arrests, and legal requirements and practices of police officers. The Town had no prior or subsequent complaints of excessive force. The Department investigated Barnard's complaints and found no violation of any practice or policy. There is no causal link between Plaintiff's arrest, the alleged harm and any Town custom or policy and there is no factual allegation as to how the Town's officers may have been improperly trained or supervised. The undisputed facts demonstrate no wrongdoing by the Town, and that the Town officers were properly trained and supervised. Judgment must enter for the Town on the § 1983 count of Barnard's Amended Complaint.

      Barnard's state law tort claims fair no better. Although he alleges that a series of state law torts were committed as a result of these events, the factual evidence made available to the court does not support the commission of any tort by any Millinocket employee or agent. Therefore, for the reasons given by the defendants in their memorandum of law, judgment should enter for them on the state law claims as well.

## Conclusion

Based upon the foregoing I recommend that the motion for summary judgment be

**GRANTED.**

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive ]memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated August 4, 2005